UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| GINGER KAY TORREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20 CV 52 DDN |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security denying the applications of plaintiff Ginger Kay Torrez for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff was born on February 18, 1970, and was 46 years old on December 20, 2016, the alleged disability onset date. (Tr. 157). She filed her applications on June 20, 2017, alleging disability due to fibromyalgia, migraines, depression, trigeminal neuralgia, attention deficit disorder, "cell" of the right thyroid, anxiety disorder, myalgia and myositis, sleep disorder, spinal stenosis, chronic fatigue, lower extremity edema, balance impairment and coordination problems, memory loss, recurrent falls, chronic pain, narcolepsy, cervical spondylosis, paresthesia numbness, tingling in both arms and hands, chronic pain in both knees, cervical kyphosis, chronic migraine and cephalgia, arthralgia and joint pain, confusion, shortness of breath with exertion, arthritis, chronic right shoulder pain, vision impairment, chronic widespread pain, cervical pain, obesity,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. *See* 42 U.S.C. § 405(g) (last sentence).

and neuropathy. (Tr. 10, 63-64). Her applications were denied and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 91-97).

On July 24, 2019, following a hearing, the ALJ issued a decision finding that plaintiff was not disabled under the Social Security Act. (Tr. 10-28). The Appeals Council denied review of that decision. (Tr. 1-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## ADMINISTRATIVE RECORD

The following is a summary of plaintiff Ginger Kay Torrez's medical and other history relevant to her appeal.

On December 27, 2016, plaintiff reported to Madison Medical Center with complaints of slurred speech and right arm pain and numbness after having an episode while in the car where she became disoriented for fifteen minutes. (Tr. 438-41, 917-20.)

A December 27, 2016 head CT scan was performed on plaintiff due to slurred speech. The results of this CT scan were normal with no acute intracranial findings. (Tr. 790.)

On December 28, 2016, plaintiff had X-rays taken of her cervical spine and right shoulder. The cervical spine X-ray showed no evidence of fracture or displacement, and no significant degenerative changes were identified. (Tr. 923.) The right shoulder X-ray showed no acute fracture or dislocation, and no bony abnormality. (Tr. 924.)

On January 12, 2017, plaintiff saw Eric K. Davis, D.O., plaintiff's treating physician, complaining of right knee pain with swelling and decreased range of motion. Her knee was drained and 14cc of serous material were removed. (Tr. 925-27.)

On January 20, 2017, an MRI of plaintiff's right knee showed a medial meniscus tear, small right knee effusion, and swelling. Minimal right knee degenerative arthritis was seen. (Tr. 928-30.)

On January 30, 2017, plaintiff saw Joseph Byrne, M.D., an orthopedic surgeon, for the right knee meniscus tear. Plaintiff stated she injured her right knee on December 20, 2016, when a car ran into her father's house and she later fell going back inside to get her father's medications. Plaintiff wished to proceed with surgery on her right knee. (Tr. 271-73.)

On February 16, 2017, plaintiff underwent a right knee arthroscopic partial medial meniscectomy. (Tr. 274-76.) Post-surgery visits with Dr. Byrne indicated plaintiff's right knee was improving. (Tr. 274-76, 290-92.)

A March 10, 2017 an MRI of plaintiff's cervical spine revealed mild cervical spondylosis resulting in mild narrowing of the central canal at C5-C6. Mild to moderate foraminal stenosis and joint degeneration were observed at C5-C6 and C6-C7. There was no evidence of demyelination or central canal stenosis. (Tr. 856-57.)

On March 10, 2017, a brain MRI showed a small nonspecific T2 high signal which was possibly related to her migraine headaches as opposed to early microvascular ischemic changes. Aside from that, the MRI of the brain was within normal limits. (Tr. 858-59.)

On March 14, 2017, plaintiff saw Dr. Davis to discuss the recent MRIs. Dr. Davis noted that plaintiff was going to follow up with Dr. Byrne. Plaintiff asked to be released back to work, which Dr. Byrne believed would help her anxiety, depression, and stress. (Tr. 448-50.)

On March 24, 2017, plaintiff visited Madison Medical Center and saw Dr. Davis with complaints of "pain." A fibromyalgia flare caused her pain and anxiety to increase. She was crying, very nervous, and anxious in the office. She did not feel she could return to work part-time on March 31, 2017. Plaintiff also had right shoulder pain and an MRI was scheduled. (Tr. 456-58, 961-63.)

Also, on March 24, 2017, plaintiff saw Dr. Byrne regarding her right knee meniscus surgery. Plaintiff reported she still had many other complaints, including head, neck, and total body pain. She became very emotional and started crying in the room. Despite this, Dr. Byrne reported that plaintiff is able to return to sit-down work at that time. (Tr. 469.)

A March 24, 2017 MRI of plaintiff's right shoulder indicated a rotator cuff tear, edema, degenerative changes of the acromioclavicular joint, and muscle atrophy. (Tr. 854-55.)

On April 3, 2017, plaintiff again saw Dr. Byrne, this time with complaints of her right shoulder pain, which extended into her neck. Plaintiff stated this injury was caused by the December 20, 2016 incident that caused her right knee medial meniscus tear. She received a steroid injection to her right shoulder to help with the pain. (Tr. 286-88.)

On May 4, 2017, plaintiff underwent surgery on her right shoulder to repair her torn rotator cuff. (Tr. 293-95.) Follow up visits with Dr. Byrne indicated that plaintiff's right shoulder was much improved with only occasional discomfort. (Tr. 296-98, 315-17.)

3

On June 19, 2017, plaintiff had a follow up visit with Dr. Byrne after her right shoulder surgery. Dr. Byrne cleared plaintiff to return to work with four-hour workdays for the first two weeks, then transitioning back to full shifts. It was noted that plaintiff understood and agreed with this return to work plan. (Tr. 315-17.)

On July 14, 2017, plaintiff visited the Madison Medical Center emergency room with swollen legs and reported a history a chronic fibromyalgia, chronic neck pain, general chronic stress, and blood pressure elevation. Documentation from this visit noted plaintiff was "very vague" about her continuous treatment with Dr. Davis and she was "easily agitated/frustrated with trying to say what her concerns actually are." Plaintiff did not have any new concerns and just stated she "can't continue to live like this. Despite this, plaintiff still exhibited 5/5 leg strength bilaterally. (Tr. 424-27, 983-86.)

On July 20, 2017, plaintiff saw Dr. Davis with issues continuing to work due to progressive worsening of symptoms. Plaintiff stated her O2 SATs drop to 89% when she is walking, but are okay at 96% when she is inactive. (Tr. 991.) She also stated her fibromyalgia is bothering her more and more. *Id.* Dr. Davis made noted that the stress of her health precludes plaintiff's ability to be gainfully employed and he recommended she stop working. (Tr. 994-95.)

On August 25, 2017, plaintiff had a three month follow up visit with Dr. Byrne after her right shoulder surgery. Dr. Byrne stated that plaintiff was doing well, had no complaints of pain in her right shoulder, had full strength and range of motion, and can return to all activities. (Tr. 996.)

On November 14, 2017, plaintiff saw Dr. Davis to discuss her health problems. Dr. Davis noted plaintiff was in obvious pain while trying to work. He noted her symptoms are gradually progressing and does not believe there will be improvement. (Tr. 1120-22.)

On January 11, 2018, plaintiff saw Barry Burchett, M.D., for an internal medicine examination. Dr. Burchett noted that plaintiff walked into the room using a walker, although it did not seem necessary. She walked with normal gait and appeared stable when standing and comfortable lying down and sitting. Plaintiff's appearance, orientation, and thinking seemed appropriate. Her mood seemed depressed as she was tearful through much of the examination. Her lower extremity muscle strength was rated 5/5 bilaterally with good effort. (Tr. 1017-22.)

An October 12, 2018, cervical MRI revealed extensive C5 and C6 edema with foraminal stenosis from a spur and small extrusion. The MRI also showed right C6-C7 neural foraminal

stenosis from a spur. He noted the edema is new and the spurring is more prominent than previous examinations. (Tr. 1091-97.) A physician review of the MRI reported stable degenerative disc disease at C5-C6 and C6-C7 due to cervical spondylosis. The report stated that the majority of plaintiff's pain is due to fibromyalgia. (Tr. 1098-1100.)

From November 2018 through April 2019, plaintiff received pain management treatment at Advanced Pain Center. (Tr. 1026-58.) Plaintiff failed to respond to conservative pain management and received several pain injections that provided temporary pain relief. *Id.*

On January 2, 2019, plaintiff saw Brian C. Schafer, M.D., an orthopedist, with complaints of right knee pain. Dr. Schafer believed her right knee showed primary osteoarthritis. (Tr. 1068-1069.) Plaintiff received a cortisone injection in her knee to help with the symptoms. *Id.*

On March 6, 2019, plaintiff saw Dr. Schafer for her right knee osteoarthritis because her right knee pain had returned after the January injection. Dr. Schafer noted plaintiff's physical exam showed the ability to stand and walk with stable symmetric gait and good lower extremity strength. (Tr. 1074-77.)

On April 29, 2019, plaintiff saw John R. Fitz, M.D., an ophthalmologist, with complaints of double vision. Both eyes showed diplopia (double vision), dry eye syndrome, and nuclear cataracts. Both lower eyelids were inflamed. (Tr. 1061-64.)

On May 6, 2019, plaintiff saw Dr. Davis for multiple issues, including fibromyalgia, neck pain, low back pain, right knee pain, and memory issues. Dr. Davis noted plaintiff has difficulty completing activities of daily living due to pain and fatigue. (Tr. 1236-40.)

**ALJ Hearing**

On June 26, 2019, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 29-62.) She lives at home with her fiancé to whom she has been engaged to for around ten years. (Tr. 49.) She last worked as a respiratory technician, a position that she held for a number of years. (Tr. 34.) She left this job in December 2016 because her pain caused her blood pressure to elevate, breaking out in sweat, double vision, and an inability to move throughout the hospital. (Tr. 37-39.) As a respiratory technician, she completed tasks such as preparing and setting up for EKGs, reviewing insurance, and getting water for patients. (Tr. 35-36.) She has been diagnosed with fibromyalgia, double/blurry vision, carpal tunnel, back issues, fatigue, sleep apnea, migraines. (Tr. 32-33, 39-41.) She does not drive and has not driven for over two years

because of her blurry vision. (Tr. 43.) Plaintiff testified that her symptoms are currently much worse than they were when she stopped working in December 2016. (Tr. 39.)

Plaintiff spends a lot of time during the day sitting and lying down to manage her pain. (Tr. 42.) She has to lay down constantly because of her pain. (Tr. 51-52.) Due to her inactivity, she has gained nearly 100 pounds in the last year. (Tr. 47-48.) She makes breakfast in the morning, does dishes, and also tries to take a shower every day. (Tr. 42-43, 48.) Due to her pain, she does not get out and about for any recreational hobbies or to run any daily errands. (Tr. 49-50.) Plaintiff claims she is unable to walk very far because of the pain and she struggles when lifting anything that weighs more than a few pounds. (Tr. 44-47.)

A vocational expert (VE) testified at the hearing. After review of plaintiff's information, the VE classified her as a respiratory technician and as a cardiac monitor technician. (Tr. 54-55.) The VE believed that plaintiff could not return to her past work as a respiratory technician. (Tr. 56-57.) While the Dictionary of Occupational Titles (DOT) indicated that plaintiff could return to work as a cardiac monitor technician, the VE testified she did not think that was realistically possible. (Tr. 56-57.) The VE testified that while she did not believe plaintiff could return to her prior occupations, she could work as a document preparer, a telephone quotation clerk, and a food and beverage order clerk. (Tr. 60-61.)

## **DECISION OF THE ALJ**

On July 24, 2019, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 7-28.) At Step One, the ALJ found plaintiff had not performed substantial gainful activity since her December 20, 2016 alleged onset date. (Tr. 12-13.) At Step Two, the ALJ found that plaintiff had the severe impairments of migraines, degenerative joint disease of the right knee, residuals of right rotator cuff repair, hypertension, anxiety disorder, degenerative disk disease of the cervical spine, fibromyalgia, and obesity. (Tr. 13-14.) However, at Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.)

At Step Four, the ALJ determined that plaintiff retained the residual functional capacity (RFC) to perform sedentary work as defined in the regulations, except that she is able to perform work that requires no more than occasional stooping, kneeling, crouching, and crawling, with no

more than moderate background noise in her work environment.  (Tr. 15-16.)  With this RFC, the ALJ found plaintiff could not perform her past relevant work.  (Tr. 22.)

Relying on vocational expert testimony, the ALJ concluded that plaintiff's impairments would not preclude her from performing other work that exists in significant numbers in the national economy, such as a document preparer and a telephone quotation clerk.  (Tr. 23.)  Consequently, the ALJ found that plaintiff was not disabled under the Social Security Act.  (Tr. 24.)

## **GENERAL LEGAL PRINCIPLES**

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings applied the relevant legal standards to facts that are supported by substantial evidence in the record as a whole.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Id.*  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision.  *Id.*  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 consecutive months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-142 (1987) (describing the five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC

7

to perform past relevant work (PRW). *Id.* at § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## **DISCUSSION**

Plaintiff argues the ALJ erred in failing to give more persuasive weight to plaintiff's treating physician, in contrast to physicians who treated plaintiff less frequently, and that the ALJ instead relied on "common sense." She also argues that the ALJ erred by not properly considering whether plaintiff was limited to less than the full range of sedentary work.

### A.     **Weight of Medical Evidence**

Plaintiff argues the ALJ erred by failing to find the opinion of Dr. Davis, her treating physician for eleven years, more persuasive than the opinions of Dr. Byrne and Dr. Burchett, who only provided treatment to plaintiff a handful of times, in determining her RFC. She argues that the opinion of a treating physician is entitled to "greater weight" and "special deference" under the Social Security regulations. She further argues that Dr. Davis was able to watch her at work for the past eleven years and thus he is better able to provide an opinion as to plaintiff's RFC. Finally, plaintiff claims Dr. Davis' opinion is entitled to greater weight because it was consistent throughout and was based on significant medical treatment and tests, with the record containing 970 pages of medical evidence.

The Court disagrees. Plaintiff's argument is based on 20 C.F.R. § 404.1527(c)(2), which provides that more weight is given to treating physicians since they can provide a more detailed, longitudinal picture of the medical impairments. However, the regulation plaintiff invoked, 20 C.F.R. § 404.1527(c)(2), applies to claims filed *before* March 27, 2017. For claims filed *after* March 27, 2017, 20 C.F.R. § 404.1520c applies. Plaintiff's claim was filed on June 20, 2017. Thus, the new regulations apply for considering the proper weight to physician opinions.

The new regulations do not require additional weight be given to a treating physician's opinion. Instead, for claims filed after March 27, 2017, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20

8

C.F.R. § 404.1520c(a). Rather, the ALJ is to consider factors in determining how persuasive to find medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(b). The two most important factors an ALJ *must* consider in evaluating a medical opinion are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Additional factors that an ALJ *may*, but are not required to, consider in evaluating a medical opinion are the relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, the examining relationship, specialization, and additional factors that tend to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(c)(3)-(5).

The ALJ evaluated the medical opinions of Dr. Davis and Dr. Byrne. The ALJ reviewed all the records and opinion of Dr. Davis and concluded that his medical opinions were "not persuasive." This conclusion was based on two reasons. First, the ALJ found that Dr. Davis's opinions do not state what plaintiff is still able to do and merely recite her symptoms. (Tr. 21.) Dr. Davis stated that plaintiff was unable to work, but the treatment records do not reflect limitations severe enough to warrant this finding. (Tr. 21.) Second, some of the physical exam findings noted by Dr. Davis subsequent to his opinions were within mostly normal limits. (Tr. 21.) On the other hand, the ALJ found Dr. Byrne's opinions to be persuasive and consistent with other evidence located in the record that noted plaintiff's lack of significant limitations. (Tr. 21.)

In accordance with the standard set forth in 20 C.F.R. § 404.1520c(b)(2), the ALJ determined that Dr. Byrne's opinion was consistent with the other evidence throughout the medical records that supported the opinion that plaintiff lacked significant limitations. On the other hand, the ALJ found that Dr. Davis's opinion was inconsistent and not supported by additional treatment records. The ALJ properly considered the factors of supportability and consistency as required by 20 C.F.R. § 404.1520c(b)(2). The ALJ's decision whether or not to lend weight to the fact that Dr. Davis was plaintiff's treating physician was discretionary. Viewed in its entirety, the ALJ's analysis of the entire record in determining the persuasiveness of Dr. Byrne's opinions and lack of persuasiveness of Dr. Davis's opinions is supported by substantial evidence.

Further, plaintiff argues that the ALJ's decision was based on the ALJ's exercise of his "common sense" because the ALJ stated "the claimant gave the impression that she does virtually nothing during the day other than lie down with pillows strategically placed around her body. That may be so, but it is more likely than not, that she could perform sedentary work if she chose to do

9

so." (Tr. 21.) Plaintiff further argues the ALJ admitted the medical evidence was sufficient to support that her impairments could cause her symptoms when it was stated that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms…." (Tr. 17.) However, the remainder of the ALJ's statement provides "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 17.) Plaintiff's argument that the ALJ's decision was based solely on common sense is without merit. The ALJ spent pages of the opinion discussing plaintiff's medical history and medical records, plaintiff's testimony at the ALJ hearing, and the opinions of Dr. Davis and Dr. Byrne. (Tr. 17-21.) The ALJ provided ample support for the decision reached, and there is no indication that the decision as a whole was based on the ALJ's exercise of his "common sense."

In sum, the ALJ acted properly in determining the persuasiveness of the physicians' opinions and considering all evidence in reaching the decision. The ALJ's decision is supported by substantial evidence.

**B.     Plaintiff's Capacity to Perform Sedentary Work**

Plaintiff next argues that the ALJ erred at Step Five in not properly considering whether plaintiff was limited to less than the full range of sedentary work. If so limited, plaintiff argues, there are no jobs in the national economy that she can do.

Plaintiff's argument appears to misunderstand the ALJ's opinion. The ALJ stated that "the claimant's ability to perform all or substantially all of the requirements of [the full range of sedentary work] has been impeded by additional limitations." (Tr. 23.) In order to ascertain which limitations "erode the unskilled sedentary occupational base," the ALJ elicited testimony from a vocational expert (VE) at the hearing to determine whether jobs exist in the national economy for someone with plaintiff's age, education, work experience, and RFC. (Tr. 23.) The ALJ previously determined that plaintiff was able to perform a reduced amount of sedentary level work, specifically "work that requires no more than occasional stooping, kneeling, crouching, and crawling; and no more than moderate background noise in her work environment." (Tr. 15-16.) This RFC contained limitations from the normal level of sedentary work, which generally requires listing no more than ten pounds, standing or walking no more than two hours in an eight hour day, and sitting six hours in an eight hour day. 20 C.F.R. § 404.1567(a), 416.967(a).

10

Given this limited range of sedentary work, the ALJ posed a hypothetical question to the VE consistent with the RFC finding. (Tr. 60-61.) The VE testified that a person with this RFC could perform the occupations of document preparer, telephone quotation clerk, and food and beverage clerk per the DOT. (Tr. 60-61.) However, the VE also testified that despite plaintiff falling in the DOT for these three occupations, a situation where plaintiff would have to switch positions every thirty minutes would preclude the employment. Despite this testimony, the ALJ acted properly in considering the VE's testimony that plaintiff falls under the DOT categories for these three occupations. As defendant pointed out in its brief, "[testimony] from a VE based on a properly phrased hypothetical question constitutes substantial evidence." *Milam v. Colvin*, 794 F.3d 978, 985-86 (8th Cir. 2015). The ALJ's opinion summarized the RFC of plaintiff; thus the ALJ's decision is supported by substantial evidence since the VE testified that based on the ALJ's hypothetical, plaintiff could perform three different occupations available in the national economy.

For these reasons, the Court concludes the ALJ did not err and properly considered whether plaintiff was limited to less than the full range of sedentary work.

## **CONCLUSION**

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith

          /s/   David D. Noce
          **UNITED STATES MAGISTRATE JUDGE**

Signed on July 14, 2021.